Can you pronounce your last name for me please? It is Fatale. Good morning, you have reserved two minutes for rebuttal and you can begin whenever you  Thank you, your honors. My name is Alfred Fatale. I represent plaintiff, lead plaintiff in this action, Winston Vann. I'm from the firm of Labaton Keller Cicero. This case is here appealing the district court's dismissal of the Securities Act claims arising out of Bright Health's June 2021 IPO. The complaint alleges two categories of misstatements, that the registration statement for the offering failed to disclose known or knowable operational failures and instead warned only of hypothetical future risks, and that the registration statement also affirmatively misrepresented the company's capabilities, infrastructure, and financial conditions. Okay, so those are very broad terms. Can you tell me the specific language that you think is actionable? Sure. So starting with the risk factors, the company said, the registration said the company's quote growth strategy and profitability could be negatively impacted if it failed to maintain the complexity of the business. Okay, and so I'm going to be very methodical about this because I feel like this is an inherent line drawing question. So where is the case that you think best supports the proposition that a sentence like that is actually not in the realm of optimism, that is permitted, that it's not appropriately cabined, that it doesn't, that it's an actual actionable problematic statement? What case do you think, because what I'm going to do is going to go back and look at the case at issue and see how close they are. Sure. So when talking about risk factors, I would point to Rhombach v. Chang and Myers v. Jinko Soler. Risk factors, I can understand defendant's arguments as to puffery or corporate optimism in the affirmative misstatement selection of complaint, but as to the risk factors, these are highly material statements of what is hypothetical risk. The issue is an omission of material facts of what the condition was at the company at the time. Okay, so what was specifically omitted in the this could affect the growth? Like what needs to get said for you to feel like your client received the information that they need to avoid liability? Sure. The offering documents needed to disclose the massive backlog of medical claims, which exceeded 180 days, and the millions of dollars owed to providers. They needed to disclose that rather than having this technological system that gave them great insight in the company into their customers. Okay, if it takes you more than three words to tell me what they needed to disclose, it becomes very hard. So the massive backlog. Massive backlog. 180 days. I'm sorry. 180 days. Okay. Millions of dollars owed to providers. Provider directories inaccurate as of November 2019, leading to improper denials and payment delays. Adequate staffing and vendor oversight resulting in unresolved disputes. Okay, when you have a result, it becomes just harder. So you would say that it's a provider directory, the 180 day, which isn't that the same as the massive backlog? Is that the same thing? Yeah. Okay, so it's the backlog, the provider directory being out of date, and how much they owe providers? Yep. It's those three things? Adequate staffing and vendor oversight. So you're saying the thing that they should have said was we have inadequate? I mean, what do you think was omitted? That because of that, that they could not perform accurate risk adjustments. The risk scores. I thought the risk scores were very important. Yes, the risk scores. So if they had all that backlog and the other accompanying issues that you just listed, they can't have accurate risk scores, which isn't, then that's materialized, whereas the warning suggests if that were to happen, it would be a problem. Correct, Your Honor. It could happen. You're saying it already happened. Starting in 2019, according to the witnesses. What's your best evidence, what's your best allegation that it already happened? You know, you rely on certain things that you have. Former employee number one. Right. Former employee number one talks about the widespread backlog claims, the outdated provider directories. Why is their argument with respect to employee number one is that it doesn't indicate he or she was in Arizona and doesn't indicate a nationwide widespread problem? Because defendants and the lower court before are fitting the former employee confidential witness analysis into NOVAC and the PLSRA, which requires particularity. The PLSRA and NOVAC interpreting that said that when false and misleading statements are alleged in the Exchange Act, there needs, the information and belief needs to be alleged with particularity. That amendment was not made to the Securities Act. So we're under plausibility. We're under plausibility.  And CWs or former employees in the Exchange Act case and the Securities Act case are very different. In the Exchange Act case, I'm trying to prove scienter. I do want to allege the CW that's in the room with the executive who knows what exactly is being said to the executive that's at that level. At the, in the Securities Act, I'm alleging what was knowable. The CW I want is the guy who's in the warehouse, the guy who's, you know, the guy or woman who's on the front lines. But you don't have plausibility. The argument would be if it's just happening in Arizona, it's not sufficiently plausible that this is of such a caliber that it would, it would. It is corroborated by two other former employees that were in different areas, just like in New Jersey Carpenters. It's also corroborated by defendants' own post-class period admissions, which courts find a probative of what was happening at the company. C.O. Nickin said that there were significant deteriorations in 2022 that was due to catching up on claims payments that required resubmitting a complaint that compounded by the lack of visibility into the lagging medical claims from the legacy system led to the risk score being off. CFO Smith said that 2021 was peak efficiency. And all right, so the IPO happens in basically the middle of 2021, but defendants' own disclosures when they disclosed $134 million impact from the risk adjustment scoring. This is paragraph 199 of the complaint. They attribute $89 million of that tied to the first half of 2021, the time period essentially before the IPO in June 2021. You've led me through my outline. I don't have to go through that. You don't have to use the last 30 seconds. Yes. You brought me to the end. I won't go digging around. I won't go digging for more. I'll see you on rebuttal.  Thanks. Thank you, Your Honor. Mr. Wang, you're up. Good morning, Your Honor, and may it please the Court, George Wang, Simpson Thatcher, on behalf of the defendants. Let me go directly to the two main points that counsel focused on, which is the risk score adjustments and also the backlog slash claims delay slash million issue, which I think is all one and one, part and parcel of the same thing. On the risk adjustment scores, I'm sure the panel knows what they are, but the way that the ACA works is that the customers pay largely the same premium, and the way the insurers are made whole is that insurance companies who have less healthy populations receive premiums from the insurance companies who have more healthy populations. What happened in 2021 is that, as disclosed in the perspectives, the company was engaged in gigantic growth. As disclosed in the record, S.A. 8354, the company increased by six-fold its membership in 2021. So as of September 30th, it was disclosed that 85 percent of its members across the country were newly added in 2021, so there's gigantic growth. Specifically warned in the perspectives is that when we take on new patients and we enter new markets, we don't have actual data. We've got to rely on government-provided data and historical averages to base our initial estimates of the risk adjustment scores, and we'll true those up as we get actual data. So that's exactly what happened here, and again, we're not talking about... If they had a backlog at the time of the IPO, 180 days, more than 180 days, wouldn't that be problematic with respect to the risk warnings that were made? That would suggest that the problem had materialized, that they weren't... At the time of the IPO, they didn't have enough, because of the backlog, enough information to have any accurate risk scores, or am I misunderstanding that? Wouldn't that be a problem? Three points here. The back of argument just doesn't make sense with respect to risk scores, because the company determined that its population was healthier, not less healthy, healthier, was spending less than expected, and that's why they had to pay more to the other insurers with less healthy population. Plaintiff's theory is that because of all these claims, we didn't know that our population of customers was less healthy. We're using more risk, right? So it's counterintuitive. It doesn't make sense in that regard. On the claims delay, the delays in claims processing, the prospectus disclosed that the fact of claims delays wasn't a fact that it started in 2021. It's disclosed in the prospectus, SA 140, that 90% of the company's claims were historically processed within 90 days, and the rest were within the year. So that, by definition, is 10% of claims take longer than 90 days from the date of service to get processed. So the fact that there's claims delays, the company is not denying, the question is... If there's a crisis in claim delays, that would be a problem, right? If there's a crisis in claim delays, would that be a problem or not? There would be if they weren't accurately captured in the medical cost payable estimates that are being put out by the company. What former employee one says was going on in Arizona was going on across the nation with respect to the company. Problem or no problem? Well, former employee one doesn't say that there were any inaccuracy in the company's financials. He's just saying that there were... Is there a crisis, a backlog crisis, that claims weren't getting adjudicated, it was completely out of control, that they were having all hands-on meetings to address the backlog problem, that the CFO and the CEO were involved in those meetings, that they created a war room to address the backlog problem. That, doesn't that plausibly suggest that it was a crisis, or is that not a crisis? Well, there's several issues with FE1's statements. Number one, those all-hands meetings, FE1 himself describes at page A57 as webinars. FE3, webinars. There is webinars. Appendix 57. Appendix 64, FE3 describes those... I don't know what is that, what does it matter whether it's a webinar or not? If the purpose of the webinar was to tell everybody in the company, this is a big problem, we have to address this, we have to create a war room to address this, why does it matter whether it's a webinar or not? He's describing it as a crisis where they're really just informational talks. FE3 describes it as the same all-hands meetings as PEP talks. I don't know if this is a pleading, but how you describe, it's his description, right? He describes it as a crisis, that he was present for the meetings. This isn't a hearsay, he was told there was meetings. He's at the meetings where these things are being discussed. The backlog is being discussed, how significant a problem it is, and it certainly suggests that it's not limited to Arizona. Well, FE1 is direct experiences with Arizona, right? All he has is anecdotes. He knows it's a crisis in Arizona, because he's in charge of that, right? He has personal knowledge that it's a big problem in Arizona. Well, he's not in charge of Arizona, but he's working in Arizona. So he has personal knowledge that there's a crisis in Arizona, according to him. But Arizona is one small state within all of... But then he has meetings that involve the whole company, the CFO of the company, right? The CEO of the company, for the same issue that he was having in Arizona. Yeah, the CEO and the CFO he alleges were at those meetings, or at least some of those meetings. But the issue with FE1's statements is that they're at odds with the main case that the plaintiffs rely on, which is NJ Carpenters, right? NJ Carpenters, this court was dealing with a case where there were multiple employees in multiple offices who were dealing not with anecdotal evidence, but rather with evidence... I don't know if you consider it anecdotal if you're at the meeting, though. Is that anecdotal if he's at the meeting? Anecdotal might be someone told him, hey, with this meeting, he doesn't know the details. He was at the meeting. Yes, but he never... For plausibility, how many employees do you need? How many employees do you need for plausibility? In the NJ Carpenters case, the court emphasized that there were multiple employees. Didn't set a specific threshold, right? I mean, there are two other employees. They don't have the level of information he has, but there are three employees here, right? The three employees... The other employees are suggesting that at least in their areas, there's the same problem as is in Arizona. The three employees testified of the fact that there's claims delays, right? But the fact that it takes more than 90 days to process claims was disclosed. That was a known fact. That was disclosed in the prospectus, that 90% of claims are processed within 90 days. The rest take up to a year. Substantially, all are done within a year. That's at SA 140. The question is, what did the company accurately project in its medical cost payables projections? How much in claims would come in in the future on account of the current period? And none of the FEs, not even FE 1, says that that accounting was incorrect. Critically, there's no reason... Summarizing the case, we relied on almost exclusively 9B cases. Is that accurate or not? No, New Jersey Carpenters is not a... The rest of them, other than New Jersey Carpenters. There's a whole series of sites to cases that I think are all 9B cases, right? I mean, some of them were. But New Jersey Carpenters, which was a central focus, was definitely not in focusing on former employees. And I think the plaintiffs say we rely on Novak and the PSLRA. We definitely do not. We acknowledge and agree that Iqbal, Twombly, 8A apply, but it doesn't satisfy the plausibility standard here. And I think the court below very clearly applied New Jersey Carpenters. I think I want to emphasize that the company, you know, it's historically recorded. It's always recorded. It's not a new process. For any quarter, they estimate medical cost payable, which is a combination of costs that people use health care, but it hasn't been processed yet. So they did that year after year. In 2018, 2019, and 20, they went backwards, looked at the preceding year and said, geez, did we get that right or did we get that wrong? And they found that they had accurately estimated. In fact, they had overestimated in each of the prior periods how much of medical claims payments they were. This is all in SA 140, right? So 2018, 19, 20, they'd overestimated, right? Despite all these problems plaintiffs allege, they'd overestimated how much of medical claims payments they would get in those prior years. 2021 was different, obviously. And why was that? And the reason was, as the company explained, there's two gigantic changes, really three. One is the fact of their gigantic growth, that 85 percent of its customers were new that year. I'm sorry, but the explanation of the reason sounds almost like you're providing a justification to try and explain that they didn't do it maliciously or they didn't do it improperly. He's not arguing that we need to do standard. I think what would help me, at least, is at some point, I became very confused as to whether or not you were arguing that it wasn't true that there was a backlog or that it wasn't true that the directory was off or that it wasn't true that they owed providers. Or instead, what you're at the time of the IPO, are you instead arguing that it was reasonable to have been wrong about that because you have the cautionary language? So, I mean, if you could just make clear what you're trying to get us to be with you on. Thank you, Your Honor. It's a combination of the first and the third. As it's from the perspective, many claims do take longer than 90 days to adjudicate and process. That's not denied. What we say is not alleged anywhere, either conclusorily or with particularity, is that there were claims, delays of such a nature that makes the prior accounting wrong, right? So if they had misrecorded in 2020, for example, if they should have known better in 2020, then there would have had to have been a restatement. And that was never done due to the audit of financials, right? So, yes, they got more information later. Yes, they had to take charges in future quarters. But there wasn't any retro. The best available information that they had was that there was not a backlog like that. There wasn't a backlog crisis. Is that the argument? They had made medical cost payable projections to the best of their ability based on the knowledge that they had at that point in time. And there was never a need to restate that prior period. No, like the auditor reviewed it and never said, look, you should have known better back in Q2 or back in 2020. Hence, not only do you have to take charge in the future, you should have just taken the charge back in the past. So that never happened. And that's indicative of the fact that there was no misstatement that happened in the past. The company never said, we don't have claims delays or that we might, we won't get this wrong. In fact, it said the opposite, that the most, I think the wording at SA-140 is the most significant assumption that goes into our medical cost payable projection is how many, what percentage of claims we've already processed and what's uncompleted. Can I just ask you, I just want to go back because I want to understand what your essence of the matter of law. If we were to conclude that if FE-1 is believed, that would be sufficient to set a plausible claim that the risks had materialized at the time of the IPO, what you're suggesting to me that that's not enough. There has to be corroboration of that employee. You know, New Jersey Carpenter didn't, it said in that case, there were multiple ones, but didn't say how many you need. In that case, they found it was sufficient. Would you cite to me a case where we have said, where there was an employee who made those types of allegations, still not plausible at the motion to dismiss stage. Do you have any case where we have, we have affirmed that dismissal under Rule 8, where there's been an employee who made, you know, some series of allegations like we have here. Because there wasn't more than one employee. What I'd emphasize is that... That's a bad question, but I think you understood it. No, I understand, I understand, Your Honor, but what I'd emphasize is that FE-1 doesn't say ever that the accounting treatment was wrong or that there were so many claims that they got the medical cost payable estimate wrong or that they got any of the financials they reported. Right, so you're not arguing that you need more than one employee to establish plausibility. You're just arguing that FE-1 isn't enough to establish a plausible claim. Particularly given that he's a low-level employee in Arizona, which is a small state. Florida's the biggest state. They entered Florida in 2020. It wasn't even the top four states. And the all-hands meeting just aren't enough. The all-hands meetings, these webinars, these pep talks, these are informational sessions for people. That doesn't establish that there were claims delayed. We have some discovery to see what the nature of those meetings were, whether or not they people were in crisis mode. Why shouldn't we have some discovery on that? There's a difference of opinion as to what the nature of those meetings were. But the fact that the company is in crisis mode trying to resolve a backlog isn't evidence of any misstatement, right? There are a substantial number. There's $4 billion in medical costs that year. 10% of those are unpaid after 90 days. That's $400 million. It's a substantial number. But again, it's consistent with what they disclosed and consistent with prior history and not indicative. Even if there's a big claims backlog, it's not indicative of any misstatement in the financials or otherwise. All right. I see my time is well over. Can I just ask you one question, Counselor? Yes, Your Honor. Just as we went along, I felt like there were some of the things you said were edging over towards the question of materiality. To be clear, you're not contesting the materiality question here. You're only contesting whether things were misleading, either the omissions or the affirmative statements. I mean, in respect to potpourri, right, some of those statements that they allege are potpourri. And I think potpourri goes to immateriality because no reasonable investor would rely on things like a generalized statement. So to the extent that potpourri is tied into materiality, which it is, we are, but then not for other aspects. Okay. The statement in your brief just sort of generally says we didn't raise materiality in our motion to dismiss. So you're saying your concession of materiality is limited to the claims that are the mere potpourri disputes? Well, our non-concession of materiality is limited.  You're not — In other words, we're arguing that potpourri — we are arguing that many statements are potpourri. Right. And to the extent Your Honor views potpourri as materiality or immateriality, then we are definitely arguing that. Okay. But that's what we are arguing. So all the — for example, whether there's an all-hands meeting or whether the absence — whether the backlog or whether the outdated directories were really outdated, you're not arguing that those issues were not material, those omissions. You're simply arguing that they were not omitted in a way that rendered the remaining information misleading. Yeah. And the directories issue, we said that — FE2 and 3 don't say anything about it. FE1 does. No, no. I know. What I'm trying to get to is you have a footnote that says, you know, pay no attention to the plaintiff's arguments about materiality because we didn't contest it. On that point, we're not contesting materiality. The materiality argument is only tied into potpourri. Okay. All right. Thank you. All right. Thank you. Mr. Fatale, you have two minutes. Thank you. Thank you, Your Honors. Two brief points. One, on some of the counterfactual arguments that were just made that are improper to draw in favor of defendants, that the webinars weren't about a crisis, they were informational sessions, that the projection — that the statements were made on what the executive's best knowledge was at the time. This isn't the allegations. They don't get an inference in their favor. And the Court does that, too, in the lower opinion, drawing inferences in defendants' favor. Well, they — my colleague just brought up COVID and ACA at one point about being, you know, a driver of the issue that came to light after the IPO. And the Court also below kind of, you know, engages in almost a loss causation that, oh, it was because of this, not because of the claims process, that the stock went down. Well, that's not my burden. Yeah, but what he — what I thought his argument was, was things like, you know, you owed millions of dollars to healthcare providers was completely consistent with what they revealed, because when you're talking about dollars and amounts this size, that some fractional number like 10 percent could lead to a lot of money, right? And so where is the difference between it being abstractly concerning and it actually being entirely consistent with what they said? It's defendants' own admission after the IPO that this time period was not consistent with our historical performance, that this was the peak of inefficiency, that we do have this — that we do have this claims backlog. But is that the appropriate test? Like, when they learn — isn't the question at the time that they issued, did they know that it was misleading? Or could they have known? And they also say defendants said that these were identifiable issues. Well, right, but it's not misleading to say — I mean, I'm just playing with the numbers here — that 10 percent of our cases are late, and still you be able to say they owed millions, right? Like, that's not — those two can very peaceably coexist. What I think your burden is, is to explain why a true statement could be misleading. Yes, it is misleading because of the omissions of the scope of the problem, the contrariness to them touting their technological abilities, their ability to do this in real time, to look in the continuum — So it sounds to me like you're relying on a context created by puffery to establish that particular things were actionable omissions, right? I mean, you know, somebody saying we have, like, a crackerjack team is not actionable, right? Because everybody's allowed to think that their team is great. Okay, so it sounds to me like you're saying that these omissions are inconsistent with the puffery, but he's saying they both exist, right? It can both be true that we have some amount of our cases that are big backlogs, and, you know, we have reason to be optimistic, and it's an appropriate view, and later they can say, you know what? We were too optimistic, but we have reasons to believe it. We weren't purposely omitting anything. So I think your job is to say why those omissions are actionable. With the affirmative misstatements, I think they are clear statements of present fact that are material, shown by the materiality of the later disclosures on those exact same issues that drive stock price movements. As to the risk statements, puffery does not apply to the risk statements in that same way. The risk statements are false and misleading because of omissions of actual facts on the ground at the time that are material to investors, as demonstrated by the events, the materiality demonstrated by the events. As demonstrated, that gets me. Would you be able to say point stop? Like, no, as demonstrated? I mean, because that suggests a backwards looking lens that they didn't have at the time, right? Because by definition, it's looking backwards. Is there, can you say, can you repeat the sentence and have the representation to me still be accurate if you don't use as demonstrated? Sure. Inability to look into claims, millions of dollars of backlogs, not having the process that you said you had in place is material to investors. All right. Thank you. Thank you both. We'll reserve the decision and have a good day.